UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------x

JOHN C. STANTON,

      Plaintiff,

      v.

LIGHTHOUSE FINANCIAL SERVICES,
INC, and THOMAS S. DRUNSIC,

      Defendants.

------------------------------------------------------x

Civil Action.
No. 06-10566-NG

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

The plaintiff is entitled to judgment on Counts I and II of his Complaint

(for breach of contract and violation of the Massachusetts Wage Act, G.L. c.

149, §§148-150), and for dismissal of the defendants' Counterclaim, because

the Complaint and the Answer and Counterclaim establish that, taking all

admissions and factual averments by the defendants and all reasonable

inferences therefrom as true, the defendants cannot prevail. *Pasdon v. City of*

*Peabody*, 417 F.3d 225, 226 (1st Cir. 2005).

### Factual Background

Lighthouse Financial Services, Inc. ("Lighthouse") was formed in

September 2002; the plaintiff, John C. Stanton, was one of the founders. The

company is engaged in providing so-called "lockbox" services to businesses. Such services involve receiving payments from customers of its clients, collecting the funds and remitting them to the client.

Approximately six months after Lighthouse's inception, the defendant Thomas Drunsic purchased 500 shares of its stock. On the same day, he became Lighthouse's Chief Executive Officer, Chairman of the Board and Treasurer. Drunsic continued to purchase stock in the corporation; by the end of April 2003 (according to the Defendants' Answer and Counterclaim) he was the majority shareholder.

As of April 1, 2003, the plaintiff signed an employment contract with Lighthouse on a pre-printed form. (A copy of the contract is attached to the Complaint as Exhibit A.) The contract was to last for one year. The plaintiff was to be paid $144,000. The contract provided that Mr. Stanton was not to compete with the employer during its term.

In May 2004, more than a year after the contract was signed, Mr. Stanton left Lighthouse's employ. He had not, and has not, been paid any part of his salary.

In January 2005, seven months after Mr. Stanton had left the company, Lighthouse filed for bankruptcy. The corporation was not discharged, because the petition was dismissed. However, in the course of the proceedings the corporation filed a list of creditors, signed by Drunsic under the pains and

penalties of perjury, admitting that it owed Mr. Stanton more than $180,000 in wages.

### Facts Admitted in the Defendant's Answer and Counterclaim

The defendants' Answer and Counterclaim, taken with the allegations of the complaint, establish the following facts:

a. That the plaintiff was employed under a written contract dated April 1, 2003. Answer, ¶ 13, Exhibit A to Complaint.[1]

b. That Exhibit A to the complaint is a true copy of that contract. Answer, ¶ 13.

c. That the contract required the company to pay the plaintiff a base salary of $144,000 per year. *Id.*

d. That the term of the contract was one year.

e. That the plaintiff was not paid his salary under the contract. Answer, ¶ 14.

f. That as of the date of the contract, Drunsic was the Chief Executive Officer, Chairman of the Board of Directors and Treasurer of the corporate defendant.. Answer, ¶ 10.

---

[1] Materials annexed to the complaint may be considered in a motion such as the present. *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004)

g. That Drunsic remained at least the CEO of the corporate defendant at all relevant times. See, Exh. C to the Complaint, admitted by Answer, ¶ 34.

h. That the plaintiff left the corporation's employ in May 2004. Answer, ¶ 29.

i. That Lighthouse filed for bankruptcy, but that the corporation's petition was dismissed. Answer, ¶ 33, 36.

j. That the corporation admitted, in a list of creditors filed in the Bankruptcy Court on its behalf and signed by Drunsic under oath, that the plaintiff was owed $180,256.43, in wages. Answer, ¶ 34; Exh. C to the Complaint.

For the reasons stated below, these admissions justify, indeed, require, entry of judgment for the plaintiff on his contract and wage claims, and for judgment dismissing the defendants' Counterclaims.

## The Plaintiff's Contract and Wage-Act Claims
(Counts I and II)

The defendants admit that the plaintiff was an employee of the defendant corporation. Answer, ¶ 13. Moreover, the contract between the parties—Exhibit A to the Complaint—is entitled "Employment Agreement," and the plaintiff is described as "the 'Employee.'" The contract obligated the

company to pay the plaintiff "a base salary of $144,000.00 per annum in equal semi-monthly installments." *Id.*

Section 149 of G.L. c. 148 declares that "an individual performing any service," apart from exceptions not here applicable, is an employee for purposes of the Act. Thus, the plaintiff was an employee of the defendants for purposes of the Wage Act, as well as under the terms of the contract.

Because Mr. Stanton was covered by the Wage Act, he was entitled to regular payment of his salary. The Act provides that

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him...

and also states that

> employees engaged in a bona fide executive, administrative or professional capacity...and employees whose salaries are regularly paid on a weekly basis or at a weekly rate for a work week of substantially the same number of hours from week to week may be paid bi-weekly or semi-monthly unless such employee elects at his own option to be paid monthly.

G.L. c. 149, §148. *See also Weidemann v. Bradford Group, Inc.*, 444 Mass. 698, 703-04.

The defendants cannot find refuge from their obligation to pay wages in the clause in the contract permitting deferral of the plaintiff's salary at the option of the Board of Trustees. The Wage Act voids such provisions. "No person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty." G.L.

c. 149, §148; *Dobin v. CIOview Corp.*, 16 Mass. L. Rep. 785 (Super. Ct. 2003). The logic behind this provision is plain in the purpose of the statute, which is to assure that employees receive prompt payment of their wages. *Weidemann v. Bradford Group, Inc., supra,* 444 Mass. at 308; *American Mut. Liab. Ins. Co. v. Commissioner of Labor & Indus.,* 340 Mass. 144, 147 (1959) (clear purpose of weekly wage law is to prevent unreasonable detention of wages), and *see Boston Police Patrolmen's Ass'n v. Boston,* 435 Mass. 718, 720 (2002).

Not only is Lighthouse's liability apparent, but Drunsic's is as well. Section 148 states that "any officers or agents having the management of [the] corporation shall be deemed to be the employers of the employees of the corporation within the meaning of this section." As the CEO and majority stockholder of the corporation at all relevant times, Drunsic stood as an employer alongside the corporation, and is equally liable to Mr. Stanton. "[U]nder the plain language of the statute, individuals may be held liable." *Weidemann v. Bradford Group, Inc., supra,* 444 Mass. at 313.

Having admitted that Mr. Stanton was an employee, and that the corporation failed to pay him more than $180,000 in wages, the defendants have admitted their liability to him. The Massachusetts Legislature has made it clear that all employees are entitled to be paid for their work, and that an employer may not avoid the obligation to pay salaries even with the agreement of the employee. The portion of the plaintiff's contract that would have

permitted the corporation's board of directors to defer his salary was void; the remainder of the agreement renders the defendant liable for Mr. Stanton's salary, which was admittedly not paid. Thus, the defendants have no defense to Count I of the Complaint.

Similarly, the defendants have no defense to the plaintiff's claims under the Wage Act. The statute forecloses defenses aside from payment, G.L. c. 149, §150, and there is no question that Mr. Stanton went unpaid. The defendants have no cognizable defense to Count II of the complaint.

For the foregoing reasons, the plaintiff is entitled to judgment on the pleadings with respect to his contract and Wage-Act claims.

### III. The Defendants' Counterclaims

The defendant's Counterclaim also fails to state a claim on which relief can be granted.

The first seventeen paragraphs of the Counterclaim have no relevance to the claims made. Paragraph 18, alleging that Mr. Stanton "refused" to contribute capital to the business, is irrelevant even if true; an investor has no obligation to put additional money into a venture. What is significant, with respect to Mr. Stanton's stock holdings, is that at the time he left the corporation's employ, he owned only 18.6 percent of the corporation's stock. Answer, ¶ 25.

The heart of the defendants' counterclaim is contained in Paragraph 19, which alleges that, <u>after leaving Lighthouse's employment</u>:

a) Mr. Stanton obtained employment with a competitor; and

b) he solicited business from Lighthouse's customers.

Neither of these allegations, even if factually accurate, state a claim on which the defendants may recover.

<u>Count I</u>
(For breach of contract)

The clear language of the contract between the parties states that the employee is restricted from competing only "during the term of employment hereof." Exhibit A, ¶ 8. By the terms of the defendants' allegations ("<u>after his resignation</u>, Stanton took affirmative steps seeking to harm the interests of Lighthouse," Counterclaim, ¶ 19)(emphasis supplied), the plaintiff did not become employed by a competitor or seek to solicit business from Lighthouse's customers until after his employment with the defendant had ceased.[2] At that time, Mr. Stanton was a free agent. Thus, on the terms of the contract and the allegations in Count I of the counterclaim, the defendants' claim for breach of contract must fail.

---

[2] The only actions alleged to have been contrary to Lighthouse's interest were related to his new employment.

## Count II
### (For breach of fiduciary duties)

Count II of the Counterclaim, alleging breach of fiduciary duty, is also fatally deficient. This count is based on the same allegations as Count I, and is similarly devoid factual sufficiency. Although dictum in *Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 593, n. 17(Mass. 1975), suggests that a minority shareholder has fiduciary duties to other shareholders in certain circumstances, that concept has never been applied in a context like the present. In fact, when conditions such as those in this case have arisen, courts have found no breach of duty.

A number of cases have held that employee-stockholders may prepare to compete with their employer while still working for the company, so long as they do not actually go into business until they have left. *See Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 163 (Mass. App. Ct. 1999), *further rev. den.*, 429 Mass. 1105 (1999), and cases cited there. In *Cain v. Cain*, 3 Mass. App. Ct. 467, 476-477 (Mass. App. Ct. 1975), the key to the court's finding that there was a violation of fiduciary duty was not that the defendant was a 50-percent shareholder, but that he had obtained customers for his new venture while still employed at the old one. The court suggested that a minority stockholder would be in a different position from an equal or majority shareholder: "We are not here concerned with a minority stockholder not involved in

management." 3 Mass. App. Ct. at 476, n. 11. *See also Dowell v. Bitner*, 273 Ill. App. 3d 681, 690, 652 N.E.2d 1372, 1378 (1995). The necessary inference from cases like these is that—absent an agreement to the contrary—employee/stockholders may compete vigorously once they have ended their employment relationship with the company.

In *Lampert, Hausler & Rodman, P.C. v. Gallant*, 19 Mass. L. Rep. 283 (Mass. Super. Ct. 2005) a current shareholder was competing with his former employer. There, one shareholder in a law firm took steps to dissolve the professional relationship with the two other share owners. Judge van Gestel held that the members of a law firm have fiduciary duties at as high a level, if not higher, than those that of stockholders in a business corporation have toward one another. Nonetheless, the court held that there had not been a breach of fiduciary obligations, because apart from a letter to clients announcing the firm's break-up—which contained no solicitation and was honest and truthful—the only steps taken by the departing shareholder in advance of giving his resignation were preparatory. That was so even though the departing attorney remained a shareholder in his old firm.[3] (A copy of the decision in *Lampert, Hausler & Rodman* is attached to this Memorandum as Exhibit 1.)

---

[3] A problem faced by that individual, as well as by Mr. Stanton and many others in his position, is that they cannot, as a practical matter, dispose of their stock.

The principle that an employee may compete with his former employer flows naturally from the right of individuals to earn a living. *Truax v. Raich*, 239 U.S. 33, 41 (U.S. 1915). Mr. Stanton should be able to pursue the field in which he has experience and knowledge, so long as he does not violate a contract or take unfair advantage of his former position. The defendants have alleged neither. Counterclaim, ¶ 19.

The plaintiff's employment contract expired by its terms on April 1, 2004—more than a month before he left the corporation's employ. Answer, ¶ 29, Exh. A, ¶ 2. The non-competition provision of the contract must have expired no later than the date that he stopped being employed.[4] Once the contract expired, the plaintiff was an at-will employee. In Massachusetts,

> [t]he general policy considerations are that at-will employees should be allowed to change employers freely and competition should be encouraged. If an employer wishes to restrict the post-employment competitive activities of a key employee, it may seek that goal through a non-competition agreement.

*Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 172 (Mass. 1991), and *see Merch. Bus. Solutions v. Arst*, 2006 Mass. Super. LEXIS 95, 4-5 (Mass. Super. Ct. 2006), and *Town & Country House & Homes Service, Inc. v. Evans*, 150 Conn. 314, 317, 189 A.2d 390, 393 (Conn. 1963). By seeking to impose non-existent fiduciary duties on Mr. Stanton, the defendants ask the court to re-write the plaintiff's

---

[4] Arguably, the provision did not survive the term of the written contract, but that is not an issue that the court need decide.

contract to add a provision that would restrict him from earning a living in his chosen field in a manner sanctioned by law. Their claim is contrary to Massachusetts law and should be dismissed.

## Count III
### (For breach of G.L. c. 93A)

The defendants do not state which section of G.L. c. 93A they rely on. However, their claim must be based on §11, because §9 relates to dealings between businesses and their customers; clearly such a relationship did not obtain between Mr. Stanton and the defendants. However, §11 is also inapplicable to this case.

Section 11 precludes the use of unfair or deceptive practices by a person engaging in trade or commerce upon another person so engaged. Disputes that "arise out of the employment relationship" are not within the reach of c. 93A. The Supreme Judicial Court has ruled that they are more like a dispute within an organization than a matter involving two business entities, which is what §11 contemplates. *Aretakis v. Gen. Signal, Inc.*, 2006 U.S. Dist. LEXIS 38058 (D. Mass.); *Manning v. Zuckerman*, 388 Mass. 8, 14, 15, 444 N.E.2d 1262 (1983).

Nor can a disagreement among the principals of a venture be the subject of a successful action under G.L. c. 93A, §11. Such a dispute is treated in the same manner as if it related to employment, and for the same reasons.

*Zimmerman v. Bogoff*, 402 Mass. 650 (Mass. 1988) (fifty-percent shareholders);

*Hanover Ins. Co. v Sutton, supra.*

There is, then, no set of facts as alleged in the counterclaim on which the defendants could prevail under G.L. c. 93A.

## CONCLUSION

For the reasons stated herein, the court should enter judgment on the pleadings for the plaintiff on Counts I and II of the Complaint, and should dismiss the defendants' Counterclaim in its entirety.

August 2, 2006

Respectfully submitted,

John C. Stanton,
Plaintiff
by his attorneys,

*Jonathan J. Margolis*
Jonathan J. Margolis
BBO #319980
Laurie A. Frankl
BBO # 647181
Rodgers Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

CERTIFICATE OF SERVICE

I hereby certify that the foregoing document(s), filed through the ECF system will be served electronically upon all registered participants as identified in the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non-registered parties this 3rd day of August 2006.

_Jonathan J. Margolis_
Jonathan J. Margolis

# <u>EXHIBIT 1</u>

**Lampert, Hausler & Rodman, P.C. v. John F. Gallant et al. n1**

n1 Timothy J. Ervin and Gallant & Ervin, LLC as defendants. Alan G. Lampert, Douglas E. Hausler and Lampert, Hausler & Rodman, P.C. as third-party plaintiffs and a counter-claimant.

**03-1977 BLS**

**SUPERIOR COURT OF MASSACHUSETTS, AT SUFFOLK**

*19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118*

**April 4, 2005, Decided**

**JUDGES:** [*1] Allan van Gestel, Justice of the Superior Court.

**OPINIONBY:** Allan van Gestel

**OPINION:**

FINDINGS OF FACT AND RULINGS OF LAW PRELIMINARY STATEMENT OF CLAIMS TRIED

This case was tried to the Court and a jury. Which of the several counts of the complaint, the counterclaim and the third-party claim were waived or otherwise resolved and, consequently, which were actually tried and to whom, requires some explanation.

On January 31, 2005, the defendants waived Counts IV, V, VI and VII of their counterclaim and elected to proceed on Count I (declaratory relief), Count II (conversion) and Count III (breach of fiduciary duty). At the close of all the evidence, the Court directed a verdict on Count II. Thus, on the counterclaim the case went forward on Counts I and III.

On February 1, 2005, the plaintiff and the third-party plaintiffs waived Counts I, IV, V, VI, VII, VIII, IX and XI of the complaint and Counts II and III of their third-party claim and elected to proceed on the complaint on Count II (breach of fiduciary duty against Mr. Gallant), Count III (breach of fiduciary duty against Mr. Ervin), Count X (violation of *G.L.c. 93A* by Gallant & Ervin, LLC) and Count XII (Injunctive relief) and on Count [*2] I of the third-party claim. Thereafter, because Count I of the third-party claim was also a count against Mr. Gallant for breach of fiduciary duty, it too was waived. Consequently, on the complaint the case went forward on Counts II, III, X and XII.

All of the counts of both the plaintiff's complaint and the defendants' counterclaim on which the case was tried, including Counts II and III of the complaint and Count III of the counterclaim which are equity counts, see *Merola v. Exergen Corp., 423 Mass. 461, 462, 668 N.E.2d 351 (1996)*, and Count X for violations of c. 93A and Count XII seeking injunctive relief, are triable to the Court not a jury.

When the trial began on January 24, 2005, however, several other counts that were still in play presented claims triable to a jury. Thus, the case was so tried. The jury came in with its answers to special questions on February 4,

Page 2

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

2005. By that time, the waivers of counts and the direction of a verdict on one count had occurred and all that remained were non-jury claims. Nevertheless, the Court will consider the jury's answers to special questions as advisory, but not binding, in connection with the Court's findings of fact and rulings of [*3] law.

## FINDINGS OF FACT

The plaintiff, Lampert, Hausler & Rodman, P.C. ("LH&R"), is a Massachusetts professional corporation organized under *G.L.c. 156A*. LH&R is, and always has been, a law firm with offices in Chelmsford. The firm was originally established under the name Gallant & Hausler, P.C. ("G&H").

From 1991 through 1994 John F. Gallant ("Mr. Gallant") and Douglas E. Hausler ("Mr. Hausler") were the only shareholders in G&H. In 1994, Alan G. Lampert ("Mr. Lampert") became a shareholder of G&H, and the firm's name was changed to Gallant, Hausler & Lampert, P.C. ("GH&L"). From that time forward until the present, the three shareholders held, and still hold, equal 1/3rd shares. Aside from adding Mr. Lampert as a shareholder, and experiencing two name changes, what started as G&H, became GH&L and ultimately now exists as LH&R did not change its corporate structure.

Timothy J. Ervin ("Mr. Ervin") joined GH&L as an associate attorney on October 4, 1999. Mr. Ervin was always an employee, but never a shareholder, at GH&L.

Mr. Gallant and Mr. Ervin were both involved heavily in GH&L's personal injury and related litigation practice. They worked closely together on the litigation matters. [*4]

From 1994 until the summer of 2000, the shareholders of GH&L ran the firm, for the most part, on a cooperative and consensual basis. However, in mid-2000, disagreements over personnel issues and personal issues began to emerge. The office relationships became strained and fractured, with Mr. Gallant, and to a somewhat lesser extent Mr. Ervin, and support staff that worked with them, becoming one faction, and Messrs. Lampert and Hausler, and support staff that worked with them, becoming another faction.

During the week of November 13, 2000, the three shareholders had a disagreement over the assignment of leave or vacation time to one of the employees, Kimberly Morin ("Ms. Morin"). Mr. Gallant had agreed to allow Ms. Morin to take certain time off. Messrs. Lampert and Hausler, when they learned about Ms. Morin's proposed leave, disagreed. There was a clash between Ms. Morin and Mr. Lampert, and she ultimately resigned on November 17, 2000.

Intemperate words were exchanged between Mr. Gallant and Mr. Lampert over the Morin situation, and over other personnel issues and firm management. Mr. Lampert sent a particularly crude e-mail to Mr. Gallant on November 16, 2000. It read:

> I [*5] am outraged reading Doug's e-mail. I have been lied to and played with about Varina's day off on Monday--is this the day you said ten days ago that you refused to give her? I now see and hear that there is no end in sight.
>
> Enough of this sh[..]. I am going to exercise my right to fire any employee who is insubordinate, lies to me, calls us stupid in the office or screws us over day after day. No f[...]ing way will I put up with anymore of this crap. I suggest you tell Varina she cannot take Monday off and tell Kim she cannot take days without pay.

Page 3

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

What else has been promised to make us continue to look like complete and total a[..]holes?

You should make a choice where you stand. I have made mine and I shall fight for this firm and am committed to stop this horror show.

Shortly thereafter, Mr. Gallant and Mr. Ervin had conversations about the possibility of leaving GH&L and forming their own law firm. These discussions began on Friday evening, November 17, 2000. Their plans evolved rapidly.

On Sunday, November 19, 2000, an internet domain name "gallantervinlaw.com" was reserved by Mr. Gallant's mother. On Monday, November 20, 2000, Mr. Ervin filed a certificate [*6] of organization with the Secretary of State for Gallant & Ervin, LLC ("G&E"). The certificate designated Messrs. Gallant and Ervin as the only two managers of the firm.

Also on November 20, 2000, Mr. Gallant sent to Mr. Hausler an e-mail indicating concern over events involving the employees on November 16 and 17, 2000. The final sentence of the e-mail read: "I am upset at what occurred on Thursday and Friday and when Agl [Mr. Lampert] returns we need to have a lengthy discussion as we can not operate a law office in this manner."

Sometime during the week of November 20, 2000, G&E purchased advertising space in the *Lowell Sun* to announce the opening of G&E and offer its services to the public. Also, early that week G&E had stationery prepared.

On Wednesday, November 22, 2000, G&E deposited in the mail about 180 letters addressed to 194 clients of GH&L, advising those clients of their new law firm and inviting them to transfer their business to the new firm. The letters, although mailed on November 22, 2000, were dated November 24, 2000. Messrs. Gal-

lant and Ervin knew that Thursday, November 23, 2000, was the Thanksgiving holiday, and no mail would be delivered that day. [*7]

The letters sent to clients bore the letterhead of G&E and indicated that the address for that firm was the same address as GH&L. Also, the letters included a self-addressed, stamped return envelope and an authorization form whereon the client could indicate a preference to move his or her business to the new firm, stay with Mr. Lampert "or" Mr. Hausler or go elsewhere.

The key paragraphs in the letters to clients read as follows:

Currently, we serve as primary counsel on your behalf in connection with the matters set forth on the enclosed form. As the attorneys which have direct responsibility to you, we wish to notify you of your right to determine if those matters should remain under our supervision, be transferred to Attorney Hausler or Attorney Lampert or be transferred to a different attorney altogether. As between Gallant & Ervin or Attorney Hausler or Attorney Lampert we believe your interests will be equally served regardless of your decision.

Please remember that, as the client, you control the decision to determine who will continue to represent your interests. We remain committed to continue representing you in these matters, but shall abide by your decision [*8] should you choose to transfer to Attorney Hausler or Attorney Lampert or be transferred to a different attorney altogether. Simply, we ask you to inform us as soon as possible of

Page 4

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

your decision to ensure that your interests in these matter are properly protected.

Mr. Lampert was in Florida for the entire week of the Thanksgiving holiday, and Mr. Hausler left the office on Wednesday to travel to New Jersey and visit with his brother's family there. Neither Mr. Lampert nor Mr. Hausler was expected back in the office until Monday, November 27, 2000. They were wholly unaware of what was happening at or about the office in Chelmsford until notified on Friday, November 24, 2000.

Neither Mr. Gallant nor Mr. Ervin told any of the GH&L employees or clients about their plans to leave until after notice was given to Messrs. Hausler and Lampert.

Several clients responded instantly to their solicitation by Messrs. Gallant and Ervin, stating their desire to transfer their business to G&E. Included among this group were Leo and Rosemary Hamel. The pending Hamel case was a personal injury claim against Malden Mills for severe personal injuries sustained by Leo Hamel, working as a plumbing contractor [*9] on a new mill facility, and for loss of consortium by his wife, Rosemary Hamel. Leo Hamel had a contingent fee agreement with GH&L at the time he transferred his case to G&E.

Early in the morning on November 24, 2000, Messrs. Gallant and Ervin delivered their resignation letters to Messrs. Lampert's and Hausler's desks. Because they were not there, Mr. Gallant telephoned Mr. Hausler in New Jersey and sent a facsimile notice to Mr. Lampert in Florida. In the telephone call with Mr. Hausler, Mr. Gallant stated that he was resigning, that Mr. Ervin was resigning and that they had formed G&E. Included in the letters was a paragraph that read:

Over the next few weeks we need to work out many issues concern-

ing our separation from the firm and the continuation of the representation of clients. We should place the interest of the clients as our primary concern and work as professionals to ensure as little disruption in the business as possible.

Of course, at the time that Messrs. Lampert and Hausler read the foregoing words, a number of clients were already opening their mail, reading the letters to them from Messrs. Gallant and Ervin, filling out file transfer requests and sending [*10] them back in the self-addressed stamped envelopes provided.

Mr. Hausler reached Mr. Lampert in Florida, and they each immediately came back to Massachusetts. They met at the office, along with their associate, Mr. Rodman, at about 8:00 p.m. on Friday, November 24, 2000.

At about 11:15 p.m. that evening Mr. Gallant arrived at the GH&L office. There was a very brief and tense meeting. Mr. Hausler asked Mr. Gallant, "What are you doing? Why are you using our address?" Mr. Gallant responded, "We have to work side by side. We'll give you 30 days. I've notified clients. I've got Hamel." When asked by Mr. Hausler whom he contacted, Mr. Gallant said, "It'll come in due course." Mr. Gallant then left, and Messrs. Hausler and Lampert spent the rest of the night at the office.

Earlier, on November 24, 2000, at about 10:00 p.m., Messrs. Lampert and Hausler voted to accept the resignation of Mr. Gallant as president and a director of GH&L, to change the name of GH&L to its present name, Lampert, Hausler & Rodman, P.C. and to elect Stephen J. Rodman as a director, replacing Mr. Gallant.

Messrs. Gallant and Ervin created a handwritten list of clients whom they believed would be likely to transfer [*11] their cases to G&E. This list was used in sending the several letters. A typed version of the client list was not

Page 5

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

made available to Messrs. Hausler and Lampert until December 1, 2000.

At about noon on Saturday, Messrs. Gallant and Ervin returned to the GH&L office. Messrs. Hausler and Lampert were still there, but very tired from being there all night. There was a very brief meeting. Because of Messrs. Lampert's and Hausler's exhaustion, however, the meeting ended quickly, and the parties set a time to get together again on Sunday, November 26, 2000. The Sunday meeting never occurred, however. On advice of counsel, Messrs. Hausler and Lampert called the meeting off. They also took immediate steps to secure the property, including changing the locks, changing the security code, hiring a police detail to guard the office and resolving tenancy issues with the landlord.

By the end of the day on Monday, November 27, 2000, GH&L had received authorization forms from 35 clients, requesting the change from GH&L to G&E for 77 different matters. Ultimately, 85 clients, with 337 different matters, requested transfers to G&E. Included in that group were 31 unfinished contingent fee cases. GH&L **[*12]** complied promptly with every client's request.

G&E continued to work on the Hamel case, which ultimately settled after trial, during appeal, for $ 2,700,000.00. This produced a contingent fee, plus litigation costs, to G&E of $ 924,506.85. It appears that this fee was the catalyst for the present lawsuit. The complaint was filed the day after judgment entered in the Hamel case.

By a Stipulation Concerning Contingent Fee Cases, admitted as Exhibit No. 42, the parties agreed that LH&R expended $ 94,857.90 for services rendered and $ 10,499.48 in expenses on those contingent fee cases in which the clients chose to follow Messrs. Gallant and Ervin to G&E.

RULINGS OF LAW

The resolution of this case depends to a significant extent on the teachings of two cases, *Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 328 N.E.2d 505 (1975)* and *Meehan v. Shaughnessy; Cohen, 404 Mass. 419, 535 N.E.2d 1255 (1989)*.

LH&R, formerly GH&L, is a professional corporation established pursuant to *G.L.c. 156A*. However, the founders never expended the effort to create a written agreement addressing the dissolution of the firm or the division of unfinished business thereon. Thus, when **[*13]** Mr. Gallant, a shareholder in GH&L, "resigned" and certain clients followed him to his new firm, G&E, the question of allocation of fees and disbursements gave birth to this lawsuit.

LH&R, seizing upon the close corporation status of the professional corporation, pressed Mr. Gallant, who is still a shareholder, to abide by his fiduciary duties. For Mr. Gallant, who established his new firm and is practicing law in the same town as LH&R, this was difficult because his mere competition was being held out as a breach.

GH&L, now LH&R, despite Mr. Gallant's resignation, still has: three shareholders, including Mr. Gallant; illiquid stock that cannot readily be sold; and day-to-day management that consists of the shareholders, except for Mr. Gallant. LH&R is, therefore, a closely held corporation. *Donahue, supra, 367 Mass. at 586*. See also *Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501, 528-29, 677 N.E.2d 159 (1997)*. Consequently, Messrs. Gallant, Hausler and Lampert, the three shareholders, each have some significant degree of fiduciary duties to one another, just like partners in a traditional partnership.

The fiduciary duties of lawyers in a partnership to **[*14]** their former law firm with regard to alleged improper solicitation of clients is established in *Meehan, supra, 404 Mass. at 433-38*. That LH&R is a closely held professional

Page 6

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

corporation in the practice of law does not diminish those fiduciary duties. However, other factors have an effect thereon. For example, this Court carved out of the fiduciary obligations "any such fiduciary duties [as] may otherwise prohibit John F. Gallant, Alan G. Lampert or Douglas E. Hausler from practicing law in, or not within, the law firm formerly known as Gallant, Lampert & Hausler, P.C." in a ruling before the trial began, and later clarified that ruling, as follows:

The plaintiff seeks clarification of this Court's December 17, 2004, order for partial summary judgment. There, the Court's order reads:

> For the foregoing reasons, the plaintiff's motion for partial summary judgment on issues of liability only with respect to Count II of the complaint and Count I of the third-party counterclaim is *ALLOWED* with respect to all breaches of those fiduciary duties owed by John F. Gallant to the plaintiff and with respect to all breaches of those fiduciary duties owed by Alan G. [*15] Lampert and Douglas E. Hausler to John F. Gallant, except insofar as any such fiduciary duties may otherwise prohibit John F. Gallant, Alan G. Lampert or Douglas E. Hausler from practicing law in, or not within, the law firm formerly known as Gallant, Lampert & Hausler, P.C.

> In issuing the foregoing order, the Court only intended to rule that, despite being attorneys, the parties herein each have fiduciary duties to each other because they are also shareholders in a closely held corporation, carving out only those is-

sues relating to the representation of clients. The Court did *not* intend thereby to determine whether any of the parties, in any way, breached those duties. Indeed, there was nothing before the Court that would have permitted such a ruling given the contested nature of almost everything between and among the parties here.

Memorandum and Order on Motion by the Plaintiff to Clarify Partial Summary Judgment, December 23, 2004.

There is a serious conflict in the law as established in *Meehan* between what lawyers may do when preparing for and planning to leave a law firm and the fiduciary duties that both *Meehan* and *Donahue* impose on partners in [*16] the law firm or shareholders in a closely held corporation. This conflict, however, must be resolved by higher courts than this. Until that resolution occurs, this Court must do its best to steer a proper course on the facts found.

Both *Meehan* and *Donahue*, and many cases thereafter, have described the fiduciary duty.

> It is well settled that partners owe each other a fiduciary duty of "the utmost good faith and loyalty." . . . As a fiduciary, a partner must consider his or her partners' welfare, and refrain from acting for purely private gain . . . Partners thus "may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty." . . . Meehan and Boyle owed their copartners at Parker Coulter a duty of the utmost good faith and loyalty, and were obliged to consider their copart-

Page 7

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

ners' welfare, and not merely their own.

*Meehan, supra, 404 Mass. at 433-34*

Just as in a partnership, the relationship among the stockholders must be one of trust, confidence and absolute loyalty if the enterprise is to succeed. Close corporations with substantial assets and with more numerous stockholders are no different from smaller [*17] close corporations in this regard. All participants rely on the fidelity and abilities of those stockholders who hold office. Disloyalty and self-seeking conduct on the part of any stockholder will engender bickering, corporate stalemates, and, perhaps, efforts to achieve dissolution.

*Donahue, supra, 367 Mass. at 587.*

Those grand words describe the fiduciary duties owed by Mr. Gallant, and probably, albeit to a lesser extent, Mr. Ervin, to GH&L, and by Mr. Gallant to Messrs. Lampert and Hausler. But how does this square with the following from *Meehan, supra, 404 Mass. at 435-36*?

We have stated that fiduciaries may plan to compete with the entity to which they owe allegiance, "provided that in the course of such arrangements they [do] not otherwise act in violation of their fiduciary duties." . . . Here, the judge found that Meehan and Boyle made certain logistical arrangements for the establishment of MBC. These arrangements included executing a lease for MBC's office, preparing lists of clients expected to leave Parker Coulter for MBC, and obtaining financing on the basis of these lists. We believe these logistical arrangements [*18] to establish a physical plant for the new firm were permissible . . ., especially in light of the attorneys' obligation to represent adequately any clients who might continue to retain them on their departure from Parker Coulter. Canons of Ethics and Disciplinary Rules Regulating the Practice of Law (*S.J.C. Rule 3:07, Canon 7*, as appearing in 382 Mass. 784 [1981]). There was no error in the judge's determination that this conduct did not violate the partners' fiduciary duty.

Lastly, Parker Coulter argues that the judge's findings compel the conclusion that Meehan and Boyle breached their fiduciary duties by unfairly acquiring consent from clients to remove cases from Parker Coulter. We agree that Meehan and Boyle, through their preparation for obtaining clients' consent, their secrecy concerning which clients they intended to take, and the substance and method of their communications with clients, obtained an unfair advantage over their former partners in breach of their fiduciary duties.

A partner has an obligation to "render on demand true and full information of all things affecting the partnership to any partner."

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

Page 8

*G.L.c. 108A, § 20* **[\*19]** On three separate occasions Meehan affirmatively denied to his partners, on their demand, that he had any plans for leaving the partnership. During this period of secrecy, Meehan and Boyle made preparations for obtaining removal authorizations from clients. Meehan traveled to New York to meet with a representative of USAU and interest him in the new firm Boyle prepared form letters on Parker Coulter's letterhead for authorizations from prospective MBC clients. Thus, they were "ready to move" the instant they gave notice to their partners.

See also *BBF, Inc. v. Germanium Power Devices Corp., 13 Mass.App.Ct. 166, 172, 430 N.E.2d 1221 (1982).*

Secret logistical arrangements to establish a physical plant for the new firm were permissible, as well as other matters of planning and preparing for the move. Thus, all that Messrs. Gallant and Ervin did from November 17, 2000, through the early morning announcement on November 24, 2000, has the apparent blessing of the *Meehan* court. This includes: the November 19, 2000, internet domain name reservation; the November 20, 2000, filing of a certificate of organization with the Secretary of State for G&E; the November 20, 2000, e-mail **[\*20]** from Mr. Gallant to Mr. Hausler indicating concern over events involving the employees on November 16 and 17, 2000; the purchase of advertising space in the *Lowell Sun* to announce the opening of G&E and offer its services to the public the preparation of G&E stationery; and perhaps even the November 22, 2000, mailing by G&E of 180 letters to 194 clients of GH&L advising those clients of their new law firm and inviting them to transfer their business to the new firm.

"When a partner has engaged in self-dealing, that partner has the burden to prove the fairness of his actions and to prove that his actions did not result in harm to the partnership." *Starr v. Fordham, 420 Mass. 178, 183, 648 N.E.2d 1261 (1995).* See *Meehan, supra, 404 Mass. at 441*.

As intimated above, it is not easy for this Court to reconcile the 2000 Thanksgiving-week actions of Messrs. Gallant and Ervin with the concept of "a fiduciary duty of 'the utmost good faith and loyalty' " wherein "a partner must consider his . . . partners' welfare, and refrain from acting for purely private gain." *Meehan, supra, 404 Mass. at 433*. What Messrs. Gallant and Ervin did seems more fitting in **[\*21]** Judge Kass's "rough and tumble of the world of commerce" than what is called for by Justice Cardozo's "punctilio of an honor the most sensitive." Given the law, however, this Court must follow it.

But for one thing, there appears to be no breach of any fiduciary duty by either Mr. Gallant or Mr. Ervin. That one thing is the mailing of letters to clients on November 22, 2000, dated November 24, 2000, announcing the formation of G&E and soliciting and facilitating the addressees to follow them to the new firm. To use the words of *Meehan*, Messrs. Gallant and Ervin were " 'ready to move' the instant they gave notice to their partners." *Meehan, supra, 404 Mass. at 436*. However, unlike the attorneys in *Meehan*, neither Mr. Gallant nor Mr. Ervin made any contact of any kind with any client or employee of GH&L before their resignations early in the morning of November 24, 2000. Nor did either Mr. Gallant or Mr. Ervin deny, in the face of any demand from either Mr. Lampert or Mr. Hausler, that they had any plans for leaving GH&L. Consequently, albeit reluctantly, this Court cannot say that depositing the client solicitation letters with the Postal Service with knowledge **[\*22]**

Page 9

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

that they would not be delivered until after their resignations were announced breached the fiduciary duties as limited by the SJC in *Meehan*.

LH&R also contend that the solicitation letters sent by Messrs. Gallant and Ervin to the LH&R clients were intentionally deceptive and confusing. *Meehan* also speaks to this issue.

> Finally, the content of the letter sent to the clients was unfairly prejudicial to Parker Coulter. The ABA Committee on Ethics and Professional Responsibility, in Informal Opinion 1457 (April 29, 1980), set forth ethical standards for attorneys announcing a change in professional association. Because this standard is intended primarily to protect clients, proof by Parker Coulter of a technical violation of this standard does not aid them in their claims. See *Fishman v. Brooks, 396 Mass. 643, 649, 487 N.E.2d 1377 (1986)*. We will, however, look to this standard for general guidelines as to what partners are entitled to expect from each other concerning their joint clients on the division of their practice. The ethical standard provides that any notice explain to a client that he or she has the right to decide who will continue the representation. Here, [*23] the judge found that the notice did not "clearly present to the clients the choice they had between remaining at Parker Coulter or moving to the new firm." By sending a one-sided announcement, on Parker Coulter letterhead, so soon after notice of their departure, Meehan and Boyle excluded their partners from effectively presenting their services as

an alternative to those of Meehan and Boyle.

> Meehan and Boyle could have foreseen that the news of their departure would cause a certain amount of confusion and disruption among their partners. The speed and preemptive character of their campaign to acquire clients' consent took advantage of their partners' confusion. By engaging in these preemptive tactics, Meehan and Boyle violated the duty of utmost good faith and loyalty which they owed their partners. Therefore, we conclude that the judge erred in deciding that Meehan and Boyle acted properly in acquiring consent to remove cases to MBC.

*Meehan, supra, 404 Mass. at 437-38.*

Here, unlike in *Meehan*, the letters were not on LH&R letterhead, nor were they one-sided. This Court finds that the letter gave the clients three options: (1) to follow Messrs. Gallant [*24] and Ervin to G&E; (2) to stay with Mr. Lampert or Mr. Hausler; or (3) to go elsewhere. The fact that they referred to Mr. Lampert "or" Mr. Hausler did not inject into the letters the kind of confusion asserted. And, perhaps most significantly, those few clients who actually testified, including Leo Hamel himself, recited clearly that they were not at all confused and that they fully understood that they had all three options. Given the lack of confusion, it cannot be said that Messrs. Gallant and Ervin excluded their partners or colleagues and LH&R from effectively presenting their services as an alternative to those of Messrs. Gallant and Ervin.

The foregoing rulings relate to the fiduciary duties of lawyers to their firm. Does the same

Page 10

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

conclusion follow with regard to Mr. Gallant's fiduciary duties to his two fellow shareholders at the closely held corporation GH&L? There, "the relationship among the stockholders must be one of trust, confidence and absolute loyalty." *Donahue, supra, 367 Mass. at 587.*

Here, this Court perceives the fiduciary duties of partners in a law firm to be at least as high, if not higher, than among stockholders in a corporation. Also, the [*25] case law on closely held corporations takes a similar approach as that in *Meehan* on issues relating to fiduciary duties in pre-resignation actions. See, e.g., *Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172-73, 565 N.E.2d 415 (1991).* As such, the Court concludes that there was no breach here by Mr. Gallant. And, of course, Mr. Ervin had no such duty to Messrs. Lampert and Hausler because he was not a fellow stockholder of theirs.

LH&R has made a claim under *G.L.c. 93A* against G&E only. That claim, however, is predicated on the alleged fiduciary breaches of Messrs. Gallant and Ervin. There being no breaches on the part of Messrs. Gallant and Ervin, there can be no *c. 93A* violation on the part of G&E.

It has been said that in determining whether actions are unfair in the *c. 93A* sense, this Court "should . . . focus on the nature of the challenged conduct and on the purpose and effect of that conduct." *Stagecoach Transp., Inc. v. Shuttle, Inc., 50 Mass.App.Ct 812, 817, 741 N.E.2d 862 (2001).* See also *Mass. Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 42-43, 648 N.E.2d 435 (1995).* More recently, however, the SJC appears to have reverted back to a more objective standard: [*26]

We have stated that "a practice or act will be unfair under *G.L.c. 93A, Sec. 2,* if it is (1) within the penumbra of a common law, statu-

tory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408, 573 N.E.2d 8 (1991).* We have stated that "the purpose of *G.L.c. 93A* is to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace." *Poznik v. Massachusetts Med. Professional Ins. Ass'n, 417 Mass. 48, 53, 628 N.E.2d 1 (1994).*

*Morrison v. Toys "R" Us, Inc., Massachusetts, 441 Mass. 451, 457-58, 806 N.E.2d 388 (2004).*

Here, the Court concludes that the actions of G&E clearly were not "immoral, unethical, oppressive, or unscrupulous." *PMP Assocs. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915 (1975).*

Further, the connection between G&E and LH&R is not clearly a "commercial relationship between consumers and business persons," nor did the situation occur in "the marketplace." The two [*27] law firms are, of course, in competition. But competition between lawyers in the practice of their profession cannot be prohibited by *c. 93A.*

The case that dominates the resolution of issues relating to competition between lawyers is found in *Pettingell v. Morrison, Mahoney & Miller, 426 Mass. 253, 687 N.E.2d 1237 (1997).* In *Pettingell,* the Supreme Judicial Court clarified the law in Massachusetts under its former Rule DR 2-108(A) and, in footnote 4 at page 255, noted that substantively DR 2-108(A) is the same as *Rule 5.6 of the Massachusetts Rules of Professional Conduct* that became effective on January 1, 1998. Although

Page 11

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

*Pettingell* dealt with forfeiture provisions in an agreement, its teachings provide guidance here as well. At page 257, the SJC said:

> The objective of DR 2-108(A) is to permit a lawyer who leaves a law firm to act for clients of the law firm without being discouraged from doing so by a provision for the forfeiture of funds. A forfeiture provision tends to discourage client free choice by encouraging a lawyer who leaves a firm not to compete. The broad prophylactic object of DR 2-108(A) is to forbid the inclusion of such a provision in all partnership [*28] agreements.

The SJC then went onto say, at page 258:

> Without adopting a per se rule, we join with the vast majority of jurisdictions that have generally declined to give effect to forfeiture provisions . . . *There may be situations in which,* although a forfeiture provision is inappropriate, *some reasonable recognition of a law firm's loss due to the departure of a partner should be recognized. A law firm's legitimate interest in its survival and well-being might justify a limitation on payments to a withdrawing partner in particular circumstances* . . . but that limitation would be more difficult to justify if it applied to a withdrawing partner who competes but not to all departing partners . . . A situation warranting an offsetting claim by a firm might arise when a departing partner leaves the surviving partners with onerous partnership debts, threatening the financial integrity of the firm.

(Emphasis added).

The *Pettingell* court made absolutely clear that the "basic concerns of [*Rule 5.6*] are the interests of clients, not the interrelationship of the partners and former partners as such." *Id. at 255.* "The strong public interest [*29] in allowing clients to retain counsel of their choice outweighs any professional benefits derived from a restrictive covenant." *Meehan, supra, 404 Mass. 431.*

> The concern here is to protect the clients and potential clients of the withdrawing lawyer and the law firm. An enforceable forfeiture-for-competition clause would tend to discourage a lawyer who leaves a firm from competing with it. This in turn would tend to restrict a client or potential client's choice of counsel.

*Pettingell, supra, 426 Mass. at 257.*

On the evidentiary record, no violations of c. 93A by G&E are shown.

Under the circumstances that have evolved, LH&R finds itself in the position of a law firm with contingent fee agreements with clients which have been terminated by those clients before achieving a contingency-triggering event. As such, LH&R is only entitled to recover in quantum meruit for the fair value of the firm's services up to the time the representations were terminated.

> When a client, for whatever reason, loses faith in his or her attor-

Page 12

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

ney, the client has the unqualified right to change lawyers . . . "But the right of a client so to do has not [*30] much value if the client is put at risk to pay the full contract price for services not rendered and to pay a second lawyer as well." . . . The general rule in Massachusetts is that, on discharge, an attorney has no right to recover on the contingent fee contract, but, thereafter, the attorney may recover the reasonable value of his services on a theory of quantum meruit.

*Malonis v. Harrington*, 442 Mass. 692, 700-01, 816 N.E.2d 115 (2004). See also *Opert v. Mellios*, 415 Mass. 634, 636, 614 N.E.2d 996 (1993).

Messrs. Gallant and Ervin are cognizant of the fact that these *quantum meruit*-theory fees are actually the obligation of the clients, n2 not G&E. G&E, however, does not want to put its clients in the middle of this matter and, therefore, made the following statement on page 15 of Defendants' Post-Trial Brief on Claims in Equity or Otherwise Tried to the Court:

> [Messrs.] Gallant and Ervin recognize that, in equity, this Court can fashion a remedy consistent with fairness. LH&R has a right to be paid some amount for the work performed on contingent fee cases where recovery to the client resulted. [Messrs.] Gallant and Ervin seek to avoid placing [*31] the clients in the middle of the dispute, and agree that the clients should not face legal action from LH&R for fees. Accordingly, [Messrs.] Gallant and Ervin agree that LH&R is entitled to payment of a fee on certain of the 30 contingent

fee cases consistent with the legal standards set forth in the Court's Memorandum and Order on "Unusual Legal Issues" Raised in the Pre-Trial Memorandum, dated January 24, 2005. [Messrs.] Gallant and Ervin suggest that the Court apply the well-stated legal standards to the contingent fee cases as reflected on Exhibit No. 42.

n2 They also undoubtedly remember the evidence presented that, at least for Mr. Hamel, he was told by Mr. Gallant not to worry about any GH&L fees because he--Mr. Gallant--would take care of them.

The situation is unusual because, for the reasons stated above, this Court has ruled that neither Mr. Gallant nor Mr. Ervin have breached any fiduciary duties to LH&R or to Messrs. Lampert and Hausler. This Court, therefore, does not believe that, even [*32] under the broad equitable powers available, it properly can enter a judgment against Messrs. Gallant and Ervin, or their law firm, compelling them to pay anything to anyone.

On the other hand, this Court should not, and it will not, stand in the way of Messrs. Gallant and Ervin making whatever payments to LH&R that they may choose on behalf of former LH&R clients that G&E represented after those clients followed Messrs. Gallant and Ervin to G&E. Without ruling, however, the Court observes that any such payments should be for all reasonable service rendered and expenses incurred on contingent fee clients that moved to G&E regardless of whether G&E has produced a successful result for them. The *quantum meruit* recoveries to which LH&R is entitled are for the fair value of services rendered until the time that firm was discharged as

19 Mass. L. Rep. 283; 2005 Mass. Super. LEXIS 118, *

Page 13

counsel. As noted above, the parties stipulated that this amounts to $ 105,357.38.

This Court is cognizant of the fact that its rulings are contrary to the conclusions of the jury and may not fully appreciate the intent of the SJC's holdings in *Meehan* and *Donahue*. It intends, therefore, by this decision to try to avoid any need for a retrial should **[*33]** this decision be overturned on appeal. Consequently, if there was to be a finding on appeal that Mr. Gallant breached his fiduciary duties to GH&L, or to Messrs. Lampert and Hausler, and if there also was a finding that Mr. Gallant failed to meet his burden of proving that the clients would have consented to removal in the absence of any breach of duty, see *Meehan, supra, 404 Mass. at 441*, then this Court would assess damages against Mr. Gallant in the amount of $ 555,260, plus statutory interest from the date this suit was filed. This amount is derived from the contingent fee earned on the Hamel case, which is the only client on which there was even minimal evidence that his following Mr. Gallant to G&E was not proved not to have been caused by Mr. Gallant's behavior. The Hamel fee was $ 924,507. However, Messrs. Lampert and Hausler advised the Court that the entire amount recovered by LH&R from Mr. Gallant on that fee would be considered wholly as profit to the firm. Thus, since Mr. Gallant is still a 1/3rd owner of the firm, he is entitled to retain 1/3rd of the total fee.

Mr. Gallant seeks a declaratory judgment as to his rights with respect to LH&R for purposes **[*34]** of getting out of the corporation. Among other things, he seeks the right to have access to the books and records of LH&R, as well as the financial information of LH&R, to determine the value of the corporation. This Court rules that Mr. Gallant, under an appropriate protective order, is entitled to examine, or have examined, those records because he is still a shareholder in LH&R.

At the same time, Mr. Gallant is a competitor of LH&R, and to that extent there must be limitations of the information he has access to and the use that may be made by him of such information. The sole purpose for which the information is to be made available to Mr. Gallant is to enable him to conduct an appraisal of the value of his 1/3rd stock interest therein, and for no other purpose. Further, in order to protect the confidentiality of the information from Mr. Gallant, a competitor, the information shall first only be provided to Mr. Gallant's attorney and any appraiser engaged by him. Only if those agents for Mr. Gallant are unable to understand the information for the purpose presented shall Mr. Gallant, on a properly supported motion, seek permission from the Court to examine the information himself. **[*35]**

Finally, Count XII of the complaint seeks injunctive relief. Given the foregoing findings and rulings there is no basis to grant the injunctive relief sought.

The parties are requested to proffer a proposed final judgment consistent with these findings and rulings.

Allan van Gestel

Justice of the Superior Court

DATED: April 4, 2005